IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION

JEREMIAH L.E. STEWART,

Plaintiff,

vs.

CAROLYN W. COLVIN,
Commissioner of Social Security,

Defendant.

No. C13-2029

RULING ON JUDICIAL REVIEW

## TABLE OF CONTENTS

I.   INTRODUCTION ........................................... 2

II.  PROCEDURAL BACKGROUND ............................. 2

III. PRINCIPLES OF REVIEW ................................. 3

IV.  FACTS .................................................... 5
     A.  Stewart's Education and Employment Background .......... 5
     B.  Administrative Hearing Testimony ..................... 5
         1.  Stewart's Testimony ............................ 5
         2.  Vocational Expert's Testimony .................. 7
     C.  Stewart's Medical History ........................... 9

V.   CONCLUSIONS OF LAW ................................... 15
     A.  ALJ's Disability Determination ...................... 15
     B.  Objections Raised By Claimant ....................... 17
         1.  Dr. Afridi's Opinions .......................... 18
         2.  RFC Assessment ................................ 22
     C.  Reversal or Remand ................................. 25

VI.  CONCLUSION ............................................ 26

VII. ORDER .................................................. 26

## I. INTRODUCTION

This matter comes before the Court on the Complaint (docket number 3) filed by Plaintiff Jeremiah L.E. Stewart on April 16, 2013, requesting judicial review of the Social Security Commissioner's decision to deny his applications for Title II disability insurance benefits and Title XVI supplemental security income ("SSI") benefits. Stewart asks the Court to reverse the decision of the Social Security Commissioner ("Commissioner") and order the Commissioner to provide him disability insurance benefits and SSI benefits. In the alternative, Stewart requests the Court to remand this matter for further proceedings.

## II. PROCEDURAL BACKGROUND

On April 29, 2010, Stewart applied for both disability insurance benefits and SSI benefits. In his applications, Stewart alleged an inability to work since November 25, 2008 due to residuals from a brain injury, migraine headaches, blurred vision, and memory loss. Stewart's applications were denied on June 8, 2010. On August 26, 2010, his applications were denied on reconsideration. On September 14, 2010, Stewart requested an administrative hearing before an Administrative Law Judge ("ALJ"). On October 13, 2011, Stewart appeared via video conference with his attorney before ALJ Julie K. Bruntz for an administrative hearing. Stewart and vocational expert Marian S. Jacobs testified at the hearing. In a decision dated February 15, 2012, the ALJ denied Stewart's claims. The ALJ determined that Stewart was not disabled and not entitled to disability insurance benefits or SSI benefits because he was functionally capable of performing work that exists in significant numbers in the national economy. Stewart appealed the ALJ's decision. On February 28, 2013, the Appeals Council denied Stewart's request for review. Consequently, the ALJ's November 21, 2011 decision was adopted as the Commissioner's final decision.

On April 16, 2013, Stewart filed this action for judicial review. The Commissioner filed an Answer on August 8, 2013. On September 12, 2013, Stewart filed a brief arguing

that there is not substantial evidence in the record to support the ALJ's finding that he is not disabled and that he is functionally capable of performing work that exists in significant numbers in the national economy. On December 4, 2013, the Commissioner filed a responsive brief arguing that the ALJ's decision was correct and asking the Court to affirm the ALJ's decision. On June 19, 2013, both parties consented to proceed before a magistrate judge in this matter pursuant to the provisions set forth in 28 U.S.C. § 636(c).

## III. PRINCIPLES OF REVIEW

Title 42, United States Code, Section 405(g) provides that the Commissioner's final determination following an administrative hearing not to award disability insurance benefits is subject to judicial review. 42 U.S.C. § 405(g). Pursuant to 42 U.S.C. § 1383(c)(3), the Commissioner's final determination after an administrative hearing not to award SSI benefits is subject to judicial review to the same extent as provided in 42 U.S.C. § 405(g). 42 U.S.C. § 1383(c)(3). Title 42 U.S.C. § 405(g) provides the Court with the power to: "[E]nter . . . a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . ." *Id*.

The Court will "affirm the Commissioner's decision if supported by substantial evidence on the record as a whole." *Anderson v. Astrue*, 696 F.3d 790, 793 (8th Cir. 2012) (citation omitted). Substantial evidence is defined as "'less than a preponderance but . . . enough that a reasonable mind would find it adequate to support the conclusion.'" *Id*. (quoting *Jones v. Astrue*, 619 F.3d 963, 968 (8th Cir. 2010)); *see also Brock v. Astrue*, 674 F.3d 1062, 1063 (8th Cir. 2010) ("Substantial evidence is evidence that a reasonable person might accept as adequate to support a decision but is less than a preponderance.").

In determining whether the ALJ's decision meets this standard, the Court considers "all of the evidence that was before the ALJ, but it [does] not re-weigh the evidence."

3

*Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005) (citation omitted). The Court not only considers the evidence which supports the ALJ's decision, but also the evidence that detracts from his or her decision. *Perks v. Astrue*, 687 F.3d 1086, 1091 (8th Cir. 2012); *see also Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007) (Review of an ALJ's decision "extends beyond examining the record to find substantial evidence in support of the ALJ's decision; [the court must also] consider evidence in the record that fairly detracts from that decision."). In *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994), the Eighth Circuit Court of Appeals explained this standard as follows:

> This standard is "something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal."

*Id.* (quoting *Turley v. Sullivan*, 939 F.2d 524, 528 (8th Cir. 1991), in turn quoting *Bland v. Bowen*, 861 F.2d 533, 535 (8th Cir. 1988)). In *Buckner v. Astrue*, 646 F.3d 549 (8th Cir. 2011), the Eighth Circuit further explained that a court "'will not disturb the denial of benefits so long as the ALJ's decision falls within the available 'zone of choice.'" *Id.* at 556 (quoting *Bradley v. Astrue*, 528 F.3d 1113, 1115 (8th Cir. 2008)). "'An ALJ's decision is not outside that zone of choice simply because [a court] might have reached a different conclusion had [the court] been the initial finder of fact.'" *Id.* Therefore, "even if inconsistent conclusions may be drawn from the evidence, the agency's decision will be upheld if it is supported by substantial evidence on the record as a whole." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005) (citing *Chamberlain v. Shalala*, 47 F.3d 1489, 1493 (8th Cir. 1995)); *see also Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) ("If substantial evidence supports the ALJ's decision, we will not reverse the decision merely because substantial evidence would have also supported a contrary outcome, or because we would have decided differently."); *Moore v. Astrue*, 572 F.3d 520, 522 (8th Cir. 2009) ("'If there is substantial evidence to support the Commissioner's

conclusion, we may not reverse even though there may also be substantial evidence to support the opposite conclusion.' *Clay v. Barnhart*, 417 F.3d 922, 928 (8th Cir. 2005).").

## *IV. FACTS*

### *A. Stewart's Education and Employment Background*

Stewart was born in 1978. He is a high school graduate. He attended an alternative high school for three years, and received help in his classes, including one-on-one instruction. Stewart has no education past high school.

The record contains a detailed earnings report for Stewart. The report covers the time period from 1994 to 2011. Prior to 1998, Stewart had minimal earnings (less than $1,000). From 1998 to 2009, he earned between $796.50 (2007) and $17,069.94 (2004). Stewart has no earnings since 2010.

### *B. Administrative Hearing Testimony*

#### *1. Stewart's Testimony*

At the administrative hearing, Stewart's attorney inquired about Stewart's disability onset:

> Q: And when do you think you became disabled so you couldn't work anymore? What happened at that point in time?
>
> A: I was in a car accident when I was 14 years old, riding a moped, and hit the side of a moving vehicle[.] . . . I was knocked unconscious, and woke up in the hospital. And they said that, all they said I had was a fractured thumb and some brain injury to my frontal and left lobe.
>
> Q: But you're 33 and you've worked on and off since then, is that right?
>
> A: Yep, I can't really keep a job because of my disabilities.
>
> Q: So when do you think you became disabled so you couldn't work anymore though? When did you really give up on trying to work?
>
> A: Probably about three years ago.

(Administrative Record at 41-42.) Stewart testified that he did not believe he could work at a full-time job because "there's no one that's going to hire me, because I'm not reliable."[1]

In regard to his physical health problems, Stewart stated that he suffers from neck and back pain. Stewart also indicated that he has difficulty with his knees. For example, when walking his knees sometimes "give out" on him, and he has to catch himself or fall. Stewart further testified that he hasn't driven a car in a "couple" of years due to petit mal seizures. According to Stewart, sometimes upwards of 10 to 15 times per day he involuntarily stares/focuses on one thing for short periods of time until someone snaps him out of it. Lastly, Stewart described difficulties with migraine headaches. Stewart testified that he can have migraines up to 15 times per month that last anywhere from 24 hours to multiple days. Stewart further testified that his migraines cause sensitivity to light and noise. In order to treat the migraines, Stewart must lay down in a dark, quiet, and cool place or go to the hospital for shots.

Next, Stewart's attorney and Stewart had the following colloquy regarding his physical limitations:

> Q: How long can you stand?
> A: Maybe half hour, 45 minutes. . . .
> Q: And how long can you sit? . . .
> A: Anywhere between 30 and 45 minutes. . . .
> Q: How far can you walk, in city blocks?
> A: Maybe one or two. . . .
> Q: How much weight do you think you can lift?
> A: Probably between five and 15 pounds, but it will still hurt me.
> Q: And could you do that on a repetitive basis?
> A: No. . . .

_____

[1] Administrative Record at 62.

> Q: And what about your balance, do you have problems
> with your balance?
> A: Yes I do.
> Q: What are those problems?
> A: Sometimes it'll feel like my equilibrium's off when my
> back's hurting or my neck's hurting or something, or
> you know, it's like pressing on a certain nerve and it
> will do that.
> Q: And what about stooping or crouching or kneeling, can
> you do those things?
> A: Not without pain.

(Administrative Record at 53-54.) Stewart also testified that he "frequently" has difficulty manipulating, handling, and holding items such as silverware and drinking glasses.

In addition to physical health problems, Stewart also stated that he has difficulty with mental health issues. Specifically, Stewart stated that he suffers from "very high" anxiety and depression. According to Stewart, his anxiety and depression cause him memory and attention difficulties, sleeping problems, and mood problems. Stewart stated that he generally gets along with people, but he can become angry and hostile towards people easily.

### 2. *Vocational Expert's Testimony*

At the hearing, the ALJ provided vocational expert Marian S. Jacobs with a hypothetical for an individual who:

> would need to avoid even moderate exposure to heights and
> machinery in the workplace. Further he is able to perform
> simple to mildly complex tasks.

(Administrative Record at 69.) The vocational expert testified that under such limitations, Stewart could perform his past work as a florist laborer. Next, the ALJ added the following limitations to the first hypothetical:

> this individual is limited to light work . . . and he could only
> occasionally climb ramps and stairs, never climb ladders,

ropes, or scaffolding, occasionally balance, stoop, kneel,
crouch, and never crawl.

(Administrative Record at 70.) The vocational expert testified that under such limitations,

Stewart could not perform his past relevant work, but could perform the following jobs:

(1) router (1,400 positions in Iowa and 142,000 positions in the nation), (2) laundry folder

(450 positions in Iowa and 39,000 positions in the nation), (3) addresser (240 positions

in Iowa and 24,000 positions in the nation), and final assembler of optical frames (500

positions in Iowa and 27,000 positions in the nation). Lastly, the ALJ inquired whether

the individual would be able to find employment if he or she missed three or more days

of work per month. The vocational expert responded that such a limitation would preclude

Stewart from competitive employment.

Stewart's attorney also questioned the vocational expert:

> Q:   If in addition to hypothetical one, if the person had
> cognitive defects of verbal memory and learning,
> divided attention, speed of processing, confrontation
> and executive functioning, abstract thinking, cognitive
> flexibility and deductive reasoning, and had fine hand
> motor dexterity which was impaired bilaterally, would
> that, if we added those limitations to hypothetical one,
> would he be able to return to his past relevant work?
>
> A:   I don't believe so. . . .
>
> Q:   And if they were unable to, up to 20 percent of the day,
> sustain an ordinary routine without special supervision,
> would that preclude competitive employment?
>
> A:   I think it probably would.
>
> Q:   And if they were unable to make up to 20 percent of the
> day, simple work related decisions, would that preclude
> competitive employment?
>
> A:   Yes.
>
> Q:   The judge didn't include any limitations on being
> around others. If . . . the person in hypothetical one
> were limited to . . . superficial contact . . . with the
> public, coworkers and supervisors, would that preclude
> competitive employment?

| | |
|---|---|
| A: | I don't believe so. I think that the jobs that I identified would be considered solitary in nature. |
| Q: | . . . But if the person were to work at a slow pace for up to a third of the day, that would preclude competitive employment wouldn't it? |
| A: | Yes. |
| Q: | And if we were to limit the person to [lifting] 10 pounds occasionally and less than that on a frequent basis, that would preclude these light jobs I assume, is that right? |
| A: | Yes. |
| Q: | It would also preclude competitive -- or not competitive, but past relevant work? |
| A: | Yes. |

(Administrative Record at 72-75.)

### C. Stewart's Medical History

In January 2008, Stewart reported to the Black Hawk-Grundy Mental Health Center ("BHGMHC") in Waterloo, Iowa, complaining of problems with depression and anxiety. Stewart reported the following symptoms at the time of his January 2008 visit: (1) "Very low" mood, (2) difficulty sleeping, (3) low energy, and (4) low motivation. Stewart also stated that he was experiencing "more" anxiety and felt "very" uncomfortable leaving his house. Upon examination, Dr. M.A. Chowdhry, M.D., diagnosed Stewart with depression and anxiety. Dr. Chowdhry summarized Stewart's visit as follows:

> [Stewart] . . . presents [with] concerns of depression [and] anxiety/panic. He has been a [patient at] this mental health center before for similar concerns. He has been without any mental health treatment for sometime now [and] can feel his symptoms getting worse. He is growing increasingly agoraphobic [and] losing interest in most things. He is willing to try medication therapy[.]

(Administrative Record at 336.) Dr. Chowdhry recommended medication as treatment. Stewart returned to Dr. Chowdhry in March 2008 for a follow-up appointment. Stewart reported "slight" improvement in his mood and behavior, but continued to have low

9

energy and lack motivation. Dr. Chowdhry recommended that Stewart continue medication as treatment.

In November 2009, Stewart presented at the emergency room of Allen Memorial Hospital in Waterloo. He was feeling sad, depressed, and suicidal. Dr. Abdur Rahim, M.D., noted that:

> [Stewart] admits to feeling sad, depressed, blah, hopeless, helpless, he has been lacking energy and ambition. He does not feel like doing much. He wants to be left alone. He has a problem with concentration, making decisions, etc. He had suicidal thoughts a couple of days ago, but denies having any thoughts or plans at this time and denies any history of suicidal attempt in the past.

(Administrative Record at 300.) Dr. Rahim diagnosed Stewart with depressive disorder. Stewart was released from the hospital with medication as treatment. Dr. Rahim also set up an appointment for Stewart with BHGMHC for medication management and counseling.

On January 5, 2010, Stewart met with Dr. Mohammad Afridi, M.D., at BHGMHC for a psychiatric evaluation. In reviewing Stewart's medical history, Dr. Afridi noted that:

> [Stewart] states that he does not recall anything prior to age 14 when he had suffered a head injury. . . . Information from the file indicates that [Stewart] was treated for Major Depressive Disorder, recurrent, moderate over the years and that he had a head injury at the age of 14 with a moped accident running into a car. He states that he is unsure how long he was in the hospital but he has had severe migraine headaches since that time. He also has been periodically more withdrawn or at other times sleeping to excess.

(Administrative Record at 324.) Upon examination, Dr. Afridi diagnosed Stewart with major depressive disorder, panic disorder with agoraphobia, and personality disorder. Dr. Afridi recommended medication and therapy as treatment.

On April 21, 2010, Dr. Afridi and Michelle McPoland, LMSW, Stewart's treating therapist, provided a mental health assessment update for Stewart. Dr. Afridi and McPoland noted that "[s]ince beginning treatment in 2008 [Stewart] has been primarily seen for issues with mood disorder [] which is a fairly new diagnosis, major depressive disorder and panic disorder with agoraphobia."[2] Dr. Afridi and McPoland further noted that Stewart "is fairly hot and cold when it comes to compliance and progress in his treatment. He goes for small bits of time being regular in his visits and being seen and participating in treatment and then will stop coming for periods of time."[3] Dr. Afridi and McPoland also indicated that Stewart was unemployed and had been unemployed since 2008 when he started treatment. A history of substance abuse was noted, but Dr. Afridi and McPoland opined that it was not a present problem. Dr. Afridi and McPoland concluded that Stewart's treatment goals remained the same, but cautioned that Stewart's participation at the mental health center "will more than likely be long term due to the nature of his problems."[4]

On June 7, 2010, Dr. Jennifer Ryan, Ph.D., reviewed Stewart's medical records and provided DDS with a Psychiatric Review Technique and mental residual functional capacity ("RFC") assessment for Stewart. On the Psychiatric Review Technique, Dr. Ryan diagnosed Stewart with ADHD, manic depressive disorder, mood disorder, panic disorder with agoraphobia, personality disorder, and polysubstance dependence. Dr. Ryan determined that Stewart had the following limitations: mild restriction of activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. On the mental RFC assessment, Dr. Ryan

---

[2] Administrative Record at 321.

[3] *Id.*

[4] Administrative Record at 321.

determined that Stewart was moderately limited in his ability to: carry out detailed instructions, maintain attention and concentration for extended periods, work in coordination with or proximity to others without being distracted by them, and respond appropriately to changes in the work setting. Dr. Ryan concluded that:

> Mental health symptom severity is consistent with some limitations in attention and concentration, and ability to follow complex instructions reported in function information. [Stewart's] symptoms are considered generally credible. The preponderance of the evidence contained in the file supports the assertion that [Stewart] is able to carry out simple to mildly complex instructions and perform work tasks consistent with this ability.

(Administrative Record at 340.)

On September 27, 2010, Stewart was referred to Dr. Sangeeta Goel, M.D., for consultation on his difficulties with headaches. Stewart informed Dr. Goel that he had been suffering from headaches since a head injury he sustained when he was 14 years old. Stewart reported that the headaches "start without any warning. They would be throbbing and severe in intensity, associated with severe photophobia and phonophobia and nausea."[5] Stewart indicated that he often gets treatment for the headaches at the emergency room, where he is given morphine. He stated that other medications have not provided much improvement. However, Dr. Goel noted that until recently, Stewart had not been taking any medications regularly at home. Upon examination, Dr. Goel diagnosed Stewart with migraine headaches not controlled by over-the-counter medication. Dr. Goel prescribed several medications as treatment.

On December 29, 2010, Stewart was referred to Dr. Jane A. Springer, Ph.D., for a neuropsychological evaluation. In reviewing Stewart's presenting problems, Dr. Springer noted that:

---

[5] Administrative Record at 384.

> Presenting cognitive concerns primarily included worsening memory problems. Mr. Stewart stated that he often forgets intended actions, recent conversations, names of familiar acquaintances, and the location of important objects. The onset of his memory difficulties was associated with a moped accident when he was 14 years old. . . . In addition, ever since the accident, he has had severe migraine headaches that seem to be worsening. The frequency of his migraines is about 8-15 times per month. Sometimes the severity of his migraines requires him to go to the hospital. He ranked the headache pain as a '10' sometimes, and currently at a '3' on a scale of 1 (minimum) to 10 (maximum). He takes medication but without complete relief, and has tried several other types of medications in the past. Sometimes his migraines are associated with vomiting and blurred vision. He noted he was fired from his job as a painter because he was absent often due to problems with migraines.

(Administrative Record at 388.) Upon testing, Stewart demonstrated a borderline level of intellectual functioning, cognitive deficits, impaired bilateral fine motor hand dexterity, moderate depression, and severe anxiety. Dr. Springer concluded that:

> To compensate for his cognitive deficits, Mr. Stewart should rely as much as possible on simple cognitive aids such as reminder notes, lists, calendars, and the like. His memory abilities are best with presentation of information in the visual modality, and with repetition. He should focus on one task at a time and avoid multiple simultaneous tasks. Relaxed time constraints for any given task should prove helpful, especially for those tasks requiring fine hand motor dexterity.

(Administrative Record at 392.) Dr. Springer recommended medication management for depression and anxiety with continued individual psychotherapy as treatment.

On October 31, 2011, at the request of Stewart's attorney, Dr. Afridi filled out "Mental Impairment Interrogatories" for Stewart. Dr. Afridi diagnosed Stewart with major depressive disorder, panic disorder with agoraphobia, ADHD, mood disorder, and personality disorder. According to Dr. Afridi, Stewart's signs and symptoms include:

13

poor memory, sleep disturbance, personality change, mood disturbance, recurrent panic attacks, difficulty thinking or concentrating, social withdrawal or isolation, decreased energy, and generalized persistent anxiety. Dr. Afridi opined that Stewart's treatment primarily by medication has helped, but Stewart "continues to have severe mental health issues that will be life long."[6] Dr. Afridi further opined that Stewart would miss work three or more times per month due to his impairments or treatment for his impairments. Dr. Afridi determined that Stewart was markedly limited, more than 20 percent of a workday, in his ability to: remember locations and work-like procedures, understand and remember very short, simple instructions, understand and remember detailed instructions, maintain attention and concentration for extended periods of time, perform activities within a schedule, be punctual within customary tolerances, sustain an ordinary routine without special supervision, make simple work-related decisions, accept instructions and respond appropriately to criticism from supervisors, get along with co-workers or peers without distracting them or exhibiting behavioral extremes, maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness, and respond appropriately to changes in the work setting. Dr. Afridi further determined that Stewart was extremely limited and generally unable to: carry out detailed instructions, maintain regular attendance, work in coordination with or proximity to others without being distracted by them, complete a normal workday, complete a normal work week, travel in unfamiliar places or use public transportation, and set realistic goals or make plans independently of others. Dr. Afridi concluded that Stewart had the following limitations: extreme restriction of activities of daily living, marked difficulties in maintaining social functioning, and constant deficiencies of concentration, persistence, or pace resulting in failure to complete tasks in a timely manner.

---

[6] Administrative Record at 869.

14

# V. CONCLUSIONS OF LAW

## A. ALJ's Disability Determination

The ALJ determined that Stewart is not disabled. In making this determination, the ALJ was required to complete the five-step sequential test provided in the social security regulations. *See* 20 C.F.R. §§ 404.1520(a)-(g), 416.920(a)-(g); *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); *McCoy v. Astrue*, 648 F.3d 605, 611 (8th Cir. 2011); *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007). The five steps an ALJ must consider are:

> (1) whether the claimant is gainfully employed, (2) whether the claimant has a severe impairment, (3) whether the impairment meets the criteria of any Social Security Income listings, (4) whether the impairment prevents the claimant from performing past relevant work, and (5) whether the impairment necessarily prevents the claimant from doing any other work.

*Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (citing *Eichelberger*, 390 F.3d at 590); *Perks*, 687 F.3d at 1091-92 (discussing the five-step sequential evaluation process); *Medhaug v. Astrue*, 578 F.3d 805, 813-14 (8th Cir. 2009) (same); *see also* 20 C.F.R. §§ 404.1520(a)-(g), 416.920(a)-(g). "If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled." *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006) (citing *Goff*, 421 F.3d at 790, in turn quoting *Eichelberger*, 390 F.3d at 590-91).

In considering the steps in the five-step process, the ALJ:

> first determines if the claimant engaged in substantial gainful activity. If so, the claimant is not disabled. Second, the ALJ determines whether the claimant has a severe medical impairment that has lasted, or is expected to last, at least 12 months. Third, the ALJ considers the severity of the impairment, specifically whether it meets or equals one of the listed impairments. If the ALJ finds a severe impairment that meets the duration requirement, and meets or equals a listed impairment, then the claimant is disabled. However, the

fourth step asks whether the claimant has the residual functional capacity to do past relevant work. If so, the claimant is not disabled. Fifth, the ALJ determines whether the claimant can perform other jobs in the economy. If so, the claimant is not disabled.

*Kluesner v. Astrue*, 607 F.3d 533, 537 (8th Cir. 2010). At the fourth step, the claimant "bears the burden of demonstrating an inability to return to [his] or her past relevant work." *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009) (citing *Steed v. Astrue*, 524 F.3d 872, 875 n.3 (8th Cir. 2008)). If the claimant meets this burden, the burden shifts to the Commissioner at step five to demonstrate that "given [the claimant's] RFC [(residual functional capacity)], age, education, and work experience, there [are] a significant number of other jobs in the national economy that [the claimant] could perform." *Brock*, 674 F.3d at 1064 (citing *Ellis v. Barnhart*, 392 F.3d 988, 993 (8th Cir. 2005)). The RFC is the most an individual can do despite the combined effect of all of his or her credible limitations. 20 C.F.R. § 416.945. The ALJ bears the responsibility for determining "'a claimant's RFC based on all the relevant evidence including the medical records, observations of treating physicians and others, and an individual's own description of his [or her] limitations.'" *Boettcher v. Astrue*, 652 F.3d 860, 867 (8th Cir. 2011) (quoting *Moore*, 572 F.3d at 523); 20 C.F.R. §§ 404.1545, 416.945.

The ALJ applied the first step of the analysis and determined that Stewart had not engaged in substantial gainful activity since November 25, 2008. At the second step, the ALJ concluded from the medical evidence that Stewart had the following severe impairments: ADHD, manic depressive disorder, panic disorder without agoraphobia,[7]

---

[7] Curiously, every diagnosis of panic disorder in the record suggests that Stewart's panic disorder included agoraphobia. It is unclear to the Court whether the ALJ intended her findings at the second step to include "panic disorder without agoraphobia," or whether that particular finding is a typographical error since it is generally demonstrated in the record that Stewart suffered from panic disorder *with* agoraphobia.

personality disorder, frontal lobe dysfunction, cervical degenerative disc disease with C5-C6 disc herniation, and migraine headaches. At the third step, the ALJ found that Stewart did not have an impairment or combination of impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. At the fourth step, the ALJ determined Stewart's RFC as follows:

> [Stewart] has the residual functional capacity to perform light work . . . in that he would be capable of lifting, carrying, pushing, or pulling 20 pounds occasionally and 10 pounds frequently; standing or walking 6 hours in an 8-hour workday; sitting 6 hours in an 8-hour workday. In addition, [Stewart] would be limited to occasional postural activities (i.e., balancing, stooping, kneeling, crouching, crawling, and climbing) except he could never climb ladders, ropes or scaffolds. He must avoid even moderate exposure to heights and machinery in the workplace. [Stewart] is able to perform simple to moderately complex tasks.

(Administrative Record at 17.) Also at the fourth step, the ALJ determined that Stewart was unable to perform any of his past relevant work. At the fifth step, the ALJ determined that based on his age, education, previous work experience, and RFC, Stewart could work at jobs that exist in significant numbers in the national economy. Therefore, the ALJ concluded that Stewart was not disabled.

## B. Objections Raised By Claimant

Stewart argues that the ALJ erred in two respects. First, Stewart argues that the ALJ failed to properly evaluate the opinions of Dr. Afridi, his treating psychiatrist. Second, Stewart argues that the ALJ's RFC assessment is flawed. Specifically, Stewart asserts that the ALJ failed to take into consideration how often and how long he would need to be absent from work due to his difficulties with migraine headaches. Stewart also contends that the ALJ failed to consider or address all of his limitations based on the medical evidence in the record, including his ability to reach, handle, and finger. Stewart maintains that this matter should be remanded for further consideration of Dr. Afridi's opinions and his RFC assessment.

### 1. *Dr. Afridi's Opinions*

Stewart argues that the ALJ failed to properly evaluate the opinions of his treating psychiatrist, Dr. Afridi. Specifically, Stewart argues that the ALJ failed to properly explain her reasons for accepting or rejecting Dr. Afridi's opinions in her decision. Stewart concludes that this matter should be remanded for proper consideration of Dr. Afridi's opinions.

An ALJ is required to "assess the record as a whole to determine whether treating physicians' opinions are inconsistent with substantial evidence on the record." *Travis v. Astrue*, 477 F.3d 1037, 1041 (8th Cir. 2007) (citing 20 C.F.R. § 404.1527(d)(2)). The opinion of a treating physician:

> should not ordinarily be disregarded and is entitled to substantial weight. A treating physician's opinion regarding an applicant's impairment will be granted controlling weight, provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record.

*Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000) (citations omitted).

"Although a treating physician's opinion is entitled to great weight, it does not automatically control or obviate the need to evaluate the record as a whole." *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000)). "The ALJ may discount or disregard such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions." *Id.*; *see also Travis*, 477 F.3d at 1041 ("A physician's statement that is 'not supported by diagnoses based on objective evidence' will not support a finding of disability. *Edwards v. Barnhart*, 314 F.3d 964, 967 (8th Cir. 2003). If the doctor's opinion is 'inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less weight.' *Id.*"); *Strongson v. Barnhart*, 361 F.3d 1066, 1070 (8th Cir. 2004) (an ALJ does not need to give controlling weight to a physician's RFC

assessment if it is inconsistent with other substantial evidence in the record); *Cabrnoch v. Bowen*, 881 F.2d 561, 564 (8th Cir. 1989) (the resolution of conflicts of opinion among various treating and examining physicians is the proper function of an ALJ).

The regulations also require an ALJ to give "good reasons" for giving weight to statements provided by a treating physician. *See* 20 C.F.R. § 404.1527(d)(2). The regulations also require an ALJ to give "good reasons" for rejecting statements provided by a treating physician. *Id.*; *see also Tilley v. Astrue*, 580 F.3d 675, 680 (8th Cir. 2009) ("The regulations require the ALJ to 'always give good reasons' for the weight afforded to the treating source's opinion.") (citation omitted).

In her decision, the ALJ addressed Dr. Afridi's opinions as follows:

> The undersigned has also read and considered the *Mental Impairment Interrogatories* provided by [Stewart's] treating psychiatrist, Dr. Afridi, on October 3, 2011. The doctor assessed [Stewart's] mental functioning as being extremely limited. For example, he opined [Stewart] would have extreme restrictions in activities of daily living; marked difficulties in social functioning; constant deficiencies of concentration persistence and pace; and continual episodes of decompensation in work or work-like environments. If accepted as credible, the limitations assessed by Dr. Afridi would result in [Stewart] meeting several mental listings. However, the doctor's assessment contains a checklist-style form, which appears to have been completed as an accommodation to [Stewart]. In 23 categories of mental functioning, Dr. Afridi assessed four moderate limitations, 12 marked limitations and seven extreme limitations. These limitations are in contrast to the treatment records, which show improvement with medications and sobriety (Exhibit 3F and 25F). Furthermore, the doctor consistently assessed [Stewart's] GAF scores in the 50's, and even at the time of the assessment was completed, [Stewart's] GAF score was 52. . . . A GAF score of 51-60 indicates *moderate* symptoms or moderate difficulty in social, occupational, or school functioning. The record is more consistent with Dr. Afridi's

GAF assessments during actual treatment, which reflect moderate symptoms. Overall, the doctor's recent functional assessment is internally inconsistent and generally unsupported by corresponding medical evidence. The doctor apparently relied quite heavily on the subjective report of symptoms and limitations provided by [Stewart], and seemed to uncritically accept as true most, if not all, of what [Stewart] reported. Yet, as explained elsewhere in this decision, there exist good reasons for questioning the reliability of [Stewart's] subjective complaints. The possibility always exists that a doctor may express an opinion in an effort to assist a patient with whom he or she sympathizes for one reason or another. Another reality, which should be mentioned, is that patients can be quite insistent and demanding in seeking supportive notes or reports from their physicians, who might provide such a note in order to satisfy their patients' requests and avoid unnecessary doctor/patient tension. While it is difficult to confirm the presence of such motives, they are more likely in situations where the opinion in question departs substantially from the rest of the evidence of record, as in the current case.

(Administrative Record at 21-22.)

In reviewing the ALJ's decision, the Court bears in mind that an ALJ has a duty to develop the record fully and fairly. *Cox*, 495 F.3d at 618. Because an administrative hearing is a non-adversarial proceeding, the ALJ must develop the record fully and fairly in order that "'deserving claimants who apply for benefits receive justice.'" *Wilcutts*, 143 F.3d at 1138 (quotation omitted). Furthermore, if an ALJ rejects the opinions of a treating physician, the regulations require that the ALJ give "good reasons" for rejecting those opinions. *See* 20 C.F.R. § 404.1527(d)(2). The Court finds that the ALJ has not fully met these requirements.

Here, the ALJ offers three reasons for discounting the opinions of Dr. Afridi. First, the ALJ asserts that the limitations provided by Dr. Afridi found in the "Mental Impairment Interrogatories" questionnaire, are inconsistent with Dr. Afridi's treatment

notes "which show improvement with medications and sobriety."[8] In her decision, the ALJ refers to two exhibits to support her assertion.[9] In reviewing both exhibits, the Court finds no reference of any improvement for Stewart based on his sobriety. Moreover, the Court only finds one reference to Stewart showing "slight" improvement in his mood due to medication, and that notation is from Dr. Chowdhry, Stewart's treating psychiatrist before Dr. Afridi.[10] Because the record does not substantially support the ALJ's assertion, the Court is unconvinced that this is a "good" reason for rejecting Dr. Afridi's opinions. Second, the ALJ contends that Stewart's GAF scores, which generally fall in a range of 52 to 55, are indicative of only moderate symptoms, and therefore, are inconsistent with Dr. Afridi's opinions in the mental impairment questionnaire. The ALJ correctly points out that GAF scores ranging from 51 to 60 demonstrate moderate symptoms. *See Lacroix v. Barnhart*, 465 F.3d 881, 883 (8th Cir. 2006) (providing that GAF scores between 51 and 60 are indicative of moderate symptoms). However, in *Pate-Fires v. Astrue*, 564 F.3d 935, 944 (8th Cir. 2009), the Eighth Circuit found that a GAF score in the 51-60 range was not "inconsistent with [an] opinion that [the claimant] was permanently disabled for any type of employment, nor does it constitute substantial evidence supporting the ALJ's conclusion she is not disabled." *Id*. Thus, the Court is unconvinced that focusing on what the Eighth Circuit deems inconclusive GAF scores between 52 and 55, without additional substantial evidence, constitutes a "good" reason for discounting the opinions of a long-time treating psychiatrist. Lastly, the ALJ suggests that Dr. Afridi's opinions cannot be trusted because Dr. Afridi *may* have offered his opinions because he sympathized with Stewart, and/or offered his opinions to avoid tension

---

[8] Administrative Record at 21.

[9] *See Id*. at 320-337 (Exhibit 3F) and 868-883 (Exhibit 25F).

[10] *Id*. at 330 (treatment note from Dr. Chowdhry).

in his treating relationship with him. The ALJ admits that it is "difficult to confirm the presence of such motives," and the Court finds that these speculative reasons do not constitute "good" reasons for disregarding Dr. Afridi's opinions. Therefore, the Court finds that this matter should be remanded so that the ALJ may fully and fairly develop the record with regard to Dr. Afridi's opinions. On remand, the ALJ shall provide clear reasons for accepting or rejecting Dr. Afridi's opinions and support his reasons with evidence from the record.

### 2. RFC Assessment

Stewart argues that the ALJ's RFC assessment is flawed. Specifically, Stewart argues that the ALJ failed to consider or address all of his limitations based on the medical evidence in the record, including any consideration of how often and how long he would need to be absent from work due to his difficulties with migraine headaches, or his ability to reach, handle, and finger. Stewart concludes that this matter should be reversed and remanded for further consideration and development of his RFC.

When an ALJ determines that a claimant is not disabled, he or she concludes that the claimant retains the residual functional capacity to perform a significant number of other jobs in the national economy that are consistent with claimant's impairments and vocational factors such as age, education, and work experience. *Beckley*, 152 F.3d at 1059. The ALJ is responsible for assessing a claimant's RFC, and his or her assessment must be based on all of the relevant evidence. *Guilliams*, 393 F.3d at 803; *see also Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000) (same). Relevant evidence for determining a claimant's RFC includes "'medical records, observations of treating physicians and others, and an individual's own description of his [or her] limitations.'" *Lacroix v. Barnhart*, 465 F.3d 881, 887 (8th Cir. 2006) (quoting *Strongson*, 361 F.3d at 1070). While an ALJ must consider all of the relevant evidence when determining a claimant's RFC, "the RFC is ultimately a medical question that must find at least some

support in the medical evidence of record." *Casey*, 503 F.3d at 697 (citing *Masterson v. Barnhart*, 363 F.3d 731, 738 (8th Cir. 2004)).

An ALJ also has a duty to develop the record fully and fairly. *Cox*, 495 F.3d at 618; *Sneed v. Barnhart*, 360 F.3d 834, 838 (8th Cir. 2004); *Wilcutts v. Apfel*, 143 F.3d 1134, 1137 (8th Cir. 1998). Because an administrative hearing is a non-adversarial proceeding, the ALJ must develop the record fully and fairly in order that "'deserving claimants who apply for benefits receive justice.'" *Wilcutts*, 143 F.3d at 1138 (quoting *Battles v. Shalala*, 36 F.3d 43, 44 (8th Cir. 1994)); *see also Smith v. Barnhart*, 435 F.3d 926, 930 (8th Cir. 2006) ("A social security hearing is a non-adversarial proceeding, and the ALJ has a duty to fully develop the record."). "There is no bright line rule indicating when the Commissioner has or has not adequately developed the record; rather, such an assessment is made on a case-by-case basis." *Mouser v. Astrue*, 545 F.3d 634, 639 (8th Cir. 2008) (citation omitted).

Having reviewed the entire record, the Court believes that there is significant evidence in the record regarding Stewart's difficulties with migraine headaches. There is evidence that Stewart frequently suffers from migraine headaches.[11] Stewart's migraines produce phonophobia, photophobia, and nausea.[12] At their most severe, Stewart's migraine headaches require hospital emergency room intervention. In a 17-month span between December 2009 and April 2011, Stewart went to the emergency room nine times to be treated for migraine headaches.[13] Because the ALJ determined that Stewart's

---

[11] *See* Administrative Record at 388 (treatment note discussing Stewart's frequent migraine headache problems).

[12] *Id.* at 384.

[13] *See* Stewart's Brief (docket number 10) at 14-16 (providing a summary of Stewart's nine emergency room visits for migraine headaches and multiple visits to the doctor regarding his problems with migraines).

migraine headaches constitute a severe impairment, but did not address this issue in her RFC assessment, and these headaches occur on a frequent basis, the Court concludes that the ALJ failed to fully and fairly develop the record on this issue. *See Cox*, 495 F.3d at 618 (discussing ALJ's duty to fully and fairly develop the record); *Guilliams*, 393 F.3d at 803 (discussing requirement that a claimant's RFC must be based on all relevant evidence). Accordingly, on remand, the ALJ must fully and fairly develop the record with regard to Stewart's difficulties with migraine headaches and discuss how such difficulties relate to his RFC. In particular, the ALJ should address how Stewart's migraine headaches may or may not affect his need for unscheduled breaks in an eight-hour workday or his need for absences in a forty-hour workweek.

Similarly, Stewart argues that the ALJ erred when making her RFC determination by failing to consider or address his difficulties with reaching, handling, fingering and dexterity. For example, in his brief, Stewart points out that:

> Mr. Stewart has a number of medical conditions that affect his ability to reach, handle, and finger. In 2007, Mr. Stewart suffered an injury to his hand and underwent surgical reconstruction. A 2010 neuropsychological evaluation noted slowed fingering bilaterally. More recently, in 2011, an MRI demonstrated cervical radiculopathy and difficulty gripping. These conditions, singly and in combination, affect Mr. Stewart's use of his arms, wrists, and hands. Despite this evidence, the ALJ failed to include any limitations on [Stewart's] ability to reach, handle, and finger.

Stewart's Brief (docket number 10) at 26. Additionally, Dr. Springer, a consultative examining doctor, determined that Stewart's bilateral fine motor hand dexterity was impaired. Dr. Springer opined that "[r]elaxed time constraints for any given task should prove helpful, especially for those tasks requiring fine hand motor dexterity."[14] The Court agrees with Stewart that the ALJ's failure to explicitly consider the medical evidence

---

[14] Administrative Record at 392.

regarding his impaired dexterity and ability to reach, handle, and finger requires remand. Moreover, remand is necessary because the Court finds that the ALJ's RFC assessment is not based on all of the relevant evidence, particularly with regard to Stewart's impaired dexterity and reaching, handling, and fingering difficulties. Accordingly, on remand, the ALJ must make her RFC assessment for Stewart based on all the relevant evidence, including his hand impairments.

## C. Reversal or Remand

The scope of review of the Commissioner's final decision is set forth in 42 U.S.C. § 405(g) which provides in pertinent part:

> The court shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary, with our without remanding the cause for a rehearing.

42 U.S.C. § 405(g). The Eighth Circuit Court of Appeals has stated that:

> Where the total record is overwhelmingly in support of a finding of disability and the claimant has demonstrated his [or her] disability by medical evidence on the record as a whole, we find no need to remand.

*Gavin v. Heckler*, 811 F.2d 1195, 1201 (8th Cir. 1987); *see also Beeler v. Brown*, 833 F.2d 124, 127 (8th Cir. 1987) (finding reversal of denial of benefits was proper where "the total record overwhelmingly supports a finding of disability"); *Stephens v. Sec'y of Health, Educ., & Welfare*, 603 F.2d 36, 42 (8th Cir. 1979) (explaining that reversal of denial of benefits is justified where no substantial evidence exists to support a finding that the claimant is not disabled). In the present case, the Court concludes that the medical records as a whole do not "overwhelmingly support a finding of disability." *Beeler*, 833 F.2d at 127. Instead, the ALJ simply failed to: (1) provide good reasons for rejecting the opinions of Dr. Afridi; (2) fully and fairly develop the record with regard to Stewart's difficulties with migraine headaches, and how such problems relate to his RFC; and (3) fully and fairly develop the record with regard to Stewart's difficulties with impaired

dexterity, and how such impairments relate to his RFC. Accordingly, the Court finds that remand is appropriate.

## *VI. CONCLUSION*

The Court concludes that this matter should be remanded to the Commissioner for further proceedings. On remand, the ALJ shall provide clear reasons for accepting or rejecting Dr. Afridi's opinions, and support her reasons with evidence from the record. The ALJ must also reconsider her RFC assessment for Stewart with regard to his difficulties with migraine headaches and impaired dexterity.

## *VII. ORDER*

For the foregoing reasons, it is hereby **ORDERED**:

This matter is **REVERSED** and **REMANDED** to the Commissioner of Social Security pursuant to sentence four of 42 U.S.C. § 405(g), for further proceedings as discussed herein.

DATED this __21st__ day of March, 2014.

JON STUART SCOLES
CHIEF MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA